# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| GEORGE P. MASSENGALE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 10-CV-4232-NKL ) |
| CITY OF JEFFERSON, MISSOURI, and ALLIED SERVICES, LLC, | ) ) ) ) |
| Defendants. | ) ) |

# ORDER

Before the Court are the Motion for Summary Judgment [Doc. # 39] filed by Defendant Allied Services, LLC ("Allied"), the Motion for Summary Judgment [Doc. # 41] filed by Defendant City of Jefferson, Missouri ("Jefferson City"), and the Motion for Summary Judgment [Doc. # 53] filed by Plaintiff George P. Massengale. For the following reasons, the Court grants summary judgment in favor of Defendants only with respect to Plaintiffs' federal antitrust claim and remands the remainder of the action to the Circuit Court of Cole County, Missouri.

**I.     Background**

    **A.     Relevant Undisputed Facts**[1]

---

[1] The Court has considered the parties' statements of undisputed fact which are supported by evidence.

Plaintiff Massengale has been a resident and taxpayer of Jefferson City for over 11 years. Defendant Jefferson City is a constitutional charter city located in Cole County and organized under the statutes and Constitution of Missouri. Defendant Allied is organized under Delaware law and based in Phoenix, Arizona.

### 1. Before the Solid Waste Contract

Before Defendants Jefferson City and Allied entered into an exclusive Solid Waste Contract, the residential trash collection service in Jefferson City was voluntary. Before that Solid Waste Contract took effect in November 2009, Jefferson City residents could choose between using a 95-gallon cart or 32-gallon plastic bags for the twice-a-week pickup, or they could choose some other way of disposing of their solid waste. The rate charged for rental of a 95-gallon cart was $14.88 per month.

Before the Solid Waste Contract took effect, Plaintiff Massengale purchased the bags offered for sale by the solid waste contractors (all associated with Allied) that serviced Jefferson City's solid waste collection needs. Plaintiff would dispose of his trash by placing it in the bags and setting them at the curb for collection by the solid waste contractor. During the time Plaintiff Massengale was allowed to use these bags, he seldom, if ever, set out more than one bag a month. Plaintiff paid about $1.25 per bag in December 1999, and that amount increased over time to its highest rate of $1.56 just before the effective date of the Solid Waste Contract. There were no other fees or charges for Plaintiff's regular trash pickup. Prior to the effective date of the Solid Waste Contract, Plaintiff Massengale participated in

2

recycling by taking his recyclables to the New World recycling bins provided at Memorial Park, at no cost.

Tom Brown, of the consulting firm Burns & McDonnell, submitted information to Defendant Jefferson City before the City sent out Request for Proposal # 2419 ("the RFP") on October 21, 2008, to potential solid waste collection contractors. Brown opined:

> . . . Jefferson City and Allied Waste report the following statistics relative to residential collection:
>
> • Number of single family and duplex households – 14,000
> • Number of households subscribing to cart service – approximately 7,900
> • Bag sales per week – approximately 2,600
>
> Assuming 1,300 households put out 2 bags per week, the total monthly rate for each of these households would be $12.90/month (2 bags/week x $1.49 per bag x 4.33 weeks/month). Under this assumption, as many as 4,800 households (14,000 – 7,900 – 1,300 households) pay no fees for residential waste removal. Our understanding is that the waste from these households is mainly placed in shared carts. If all these households use shared carts, Allied Waste may be removing up to 52% (4,800 households/9,200 households) more waste than it is being compensated for. At 75% use of shared carts, Allied Waste may be removing up to 39% (3,600 households/9,200 households) more waste than it is being compensated for.
> . . .
> Optional Residential Collection: Optional participation in the residential collection services offered by Allied Waste (on the basis of its contract with the City) has resulted in as many as 4,800 households not participating in payment of services for residential collection.

[Doc. # 46 at ¶ 22; *see also* Doc. # 58, Ex. T.]

## 2. The Request for Proposal and the Solid Waste Contract

Defendant Jefferson City's RFP requested two different rate proposals for residential trash collection service. The first requested rate proposal, the Base Proposal, continued

3

voluntary participation in residential trash collection service much like it had been in Jefferson City – i.e., twice-a-week pickup of either a 95-gallon container or 32-gallon plastic bags – but now including optional residential curbside recycling at an additional charge. The second requested rate proposal, the Alternate Proposal, was for curbside solid waste pickup, with curbside recycling service included at no additional cost, with collection only once per week and mandatory participation.

The RFP also required any winning bidder to provide a solid waste transfer station to be open to the public and located within Jefferson City limits, and which would be transferred to Jefferson City at no cost prior to the end of the contract period. Also in the RFP, Jefferson City required any winning bidder to construct a separate transfer station for long-distance solid waste hauling, also to be located within Jefferson City limits. The RFP required that this long-distance-haul transfer station and all of its property be transferred to Jefferson City for the price of one dollar prior to the end of the contract period.

From before the time of the RFP process, Defendant Allied has owned the only existing landfill and drop-off transfer station within Jefferson City limits. There has been no long-distance-haul transfer station within Jefferson City limits.

The RFP further required that the successful bidder agree to pay a "Street Repair Fee" (later called "Road Use Fee"). This fee would be $7.50 per ton of solid waste collected, increased annually at the same rate that solid waste collection rates were increased.

Defendant Allied's Base Proposal presented rates as follows: for cart use without the road fee, $14.90; without the transfer station, $13.30; with both, $16.24; and without both,

$13.98. Allied's Base Proposal also presented per-bag rates for customers who would choose bag service: without the road fee, $2.03; without the transfer station, $2.05; with both, $2.08; and without both, $2.00. Allied's Base Proposal presented an additional monthly recycling fee of $5.50. The Base Proposal provided for solid waste collection to occur twice weekly.

Allied's Alternate Proposal presented per-month rates for mandatory cart-only use as follows: without the road fee, $10.37; without the transfer station, $10.53; with both, $10.90; and without both, $10.01. Allied's Alternate Proposal also presented an additional monthly recycling fee of $4.50. The Alternate Proposal provided for solid waste collection to occur once per week and curbside recycling collection to occur once per week.

Defendant Jefferson City accepted Defendant Allied's bid under the alternate, mandatory rate option, using two 64-gallon carts – one for solid waste, and one for recycling. After the acceptance of Allied's proposal, which was the only proposal submitted, the requirement to build a long-distance-haul transfer station was dropped from the Solid Waste Contract. However, the Solid Waste Contract did include an obligation for Allied to pay a "Future Planning Fee" to Jefferson City, which had not been mentioned in the RFP. The Future Planning Fee provision required Allied to pay $200,000 per year to Jefferson City for the construction of a transfer station, the expansion of the existing landfill (currently owned by Allied), the creation of a new landfill, or for other similar purposes designed to assure the continuation of solid waste services in Jefferson City at a reasonable price. The Solid Waste Contract also provided that Allied would collect and haul all solid waste disposed of by City-owned facilities at no charge to Jefferson City. As of mid-January, 2011, approximately

$136,300 had been paid to Jefferson City under the Road Use Fee and the Future Planning Fee provisions of the Solid Waste Contract.

No vote by Defendant Jefferson City's voters was taken to approve such funds going to Jefferson City for street repair or for the goals associated with the Future Planning Fee. Beyond its contract-based relationship with Jefferson City, Defendant Allied's solid waste collection and removal service rates are unregulated.

Under Jefferson City's new trash ordinances – authorizing and implementing the Solid Waste Contract – Plaintiff Massengale is required to pay the contracted rate, currently $15.65 per month, regardless of how much solid waste he generates, or whether he uses or intends to use the curbside solid waste collection and recycling service at all. The Solid Waste Contract provides that Allied is entitled to increase its rates annually by an amount not to exceed the increase in the Consumer Price Index. Since the effective date of the Solid Waste Contract, there has been one rate increase, by 2.02%. Since the new trash ordinances have been in effect, Plaintiff Massengale alternates between setting out his trash cart one week and his recycling cart the next week, neither of which is ever full.

### B. Procedural History

Plaintiff Massengale filed his Petition in the Circuit Court of Cole County, Missouri, on September 17, 2010. [Doc. # 1, Ex .1.] The Petition contains five counts. Count I asserts a claim under the Hancock Amendment to the Missouri Constitution, Mo. Const., art. 10 § 22, alleging that Jefferson City levied a tax without the approval of a majority of Jefferson City voters. Count II alleges that Defendants violated Missouri antitrust laws, Mo. Rev. Stat.

§§ 416.011-416.161. Count III asserts a claim under the Clayton Antitrust Act, 15 U.S.C. § 12, et seq., for the violation of federal antitrust laws. Count IV asserts that Defendants' Solid Waste Contract is illegal, void, or voidable, because Allied failed to affirm its participation in a federal work authorization program and also failed to affirm that it did not knowingly employ unauthorized aliens, in violation of Mo. Rev. Stat. § 285.530. Finally, Count V seeks a declaratory judgment, under Mo. Rev. Stat. § 527.010, that neither Plaintiff nor any other resident of Jefferson City is required to enter into a contract with Allied.

Citing Count III of Plaintiff's Petition – invoking federal antitrust law – Defendant Allied removed this action to federal court on October 22, 2010. [Doc. # 1, ¶ 3.]

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the non-moving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a district

court must look at the record and any inferences to be drawn from it in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is not proper if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 248.

**B.     Plaintiff's Count III for Violation of Federal Antitrust Law**

Plaintiff Massengale brings Count III of his Petition under the Clayton Act:

> . . .[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a). In support of his Motion for Summary Judgment, Plaintiff clarifies that the Clayton Act prohibits any violation of federal antitrust law and that Defendants allegedly violated sections 1 and 2 of the Sherman Act. *See* 15 U.S.C. §§ 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."), 2 ("Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony").

Plaintiff Massengale summarizes his antitrust theory as follows:

> The City and Allied worked together to give Allied the entire trash collection service area in Jefferson City, under a six-year contract. A price is set for each resident to pay, under the threat of a fine for not paying it. Allied already owned the only landfill and drop-off area in the City limits (as required in the

> RFP), and worked with the City *after* submitting the only proposal, to be relieved of having to build the expensive, long-distance-haul transfer station (which also was required in the RFP to be within City limits). No other trash collection company would have a reasonable amount of time to submit plans for an expensive transfer station and drop-off area within the City limits, especially when one already exists. Allied sets its own prices, and those prices are not regulated by anyone [i.e., beyond the terms of the Solid Waste Contract].

[Doc. # 46 at 12.]

Even assuming that Plaintiff properly pleaded Count III in his Petition, and that he submitted sufficient evidence to establish a prima facie case for violation of federal antitrust laws, Count III still must fail because of the state action immunity doctrine. In *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court first determined that federal antitrust laws could not be applied to prevent states from exercising their sovereign powers to intervene in markets, even if such intervention entailed anticompetitive restraints. Chief Justice Stone found "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature" and explained that "an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Id.* at 350-51.

Later, in *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389 (1978), the Supreme Court faced the question of whether municipalities were also immune from federal antitrust liability under *Parker*'s state action doctrine. A plurality of four justices wrote that the doctrine did not extend to "all governmental entities, whether state agencies or subdivisions of a State . . . simply by reason of their status as such." *Id.* at 408. However,

those justices recognized that municipalities were instrumentalities of the state and held that the state action doctrine exempts "anticompetitive conduct engaged in . . . by [municipalities], pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413. The Eighth Circuit has characterized *City of Lafayette* as holding that "an adequate state mandate for anticompetitive activities of cities and other subordinate governmental units exists when it is found from the authority given a governmental entity to operate in a particular area, that the legislature *contemplated* the kind of action complained of." *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1011 (8th Cir. 1983) (quoting *City of Lafayette*, 435 U.S. at 415).

In *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980), the Supreme Court required active state supervision of the challenged restraint, in addition to an affirmative expression of state policy. In *Midcal*, a California statute had delegated to wine producers the power to prevent price competition by dictating the prices charged by wholesalers. *Id.* at 103. Although California's wine pricing scheme was clearly state policy, it did not qualify for antitrust immunity because there was no state supervision. *Id.* at 105 ("The State simply authorizes price setting and enforces the prices established by private parties."). Two years later, *Community Communications Co. v. City of Boulder*, 455 U.S. 40 (1982), held that the state action doctrine did not provide immunity from antitrust liability when the city acted pursuant only to the state's broad grant of "home rule" power. *Id.* at 55-56.

In 1983, the Eighth Circuit decided *Gold Cross Ambulance*, a case in which two private ambulance companies brought federal antitrust claims against Kansas City, its municipal trust, city consultants, and the private ambulance service that obtained the exclusive contract with the city through a non-competitive process. Kansas City had tasked its municipal trust with implementing a "public utility model" for ambulances within city limits, "designed to eliminate the incentive created by free-market delivery of ambulance service by private companies to neglect emergency ambulance service in favor of the more profitable nonemergency business." *Gold Cross Ambulance*, 705 F.2d at 1008. Articulating the state action immunity rule in the municipality context, the Eighth Circuit wrote that a sufficient expression of state policy consisted of two elements: (1) "The legislature must have authorized the challenged activity," and (2) "it must have done so with an intent to displace competition." *Id.* at 1011. The first element was easily satisfied:

> The state permits cities to provide ambulance service to its citizens, to acquire the necessary equipment, to "contract with one or more" operators to provide the ambulance service, and to promulgate rules to regulate the provision of that service. Mo. Rev. Stat. § 67.300.

*Id.* With respect to the second element, the Eighth Circuit wrote:

> [A] specific, detailed legislative authorization of monopoly service need not exist to infer the necessary state intent. It is sufficient that the legislature contemplated the kind of action complained of. In other words, a sufficient state policy to displace competition exists if the challenged restraint is a necessary or reasonable consequence of engaging in the authorized activity.
> . . .
> Because monopoly service is the necessary consequence of having only one municipal ambulance operator as authorized by Missouri law, [section 67.300] alone supports the district court's finding that the state intended to displace unregulated competition in the ambulance industry.

*Id.* at 1012-13 (internal quotations and citations omitted).

The Eighth Circuit in *Gold Cross Ambulance* faced only the question of whether Kansas City, its municipal trust, and its consultants were immune from antitrust liability under the state action doctrine. Judge Heaney explained that although *Midcal* had required active state supervision of the challenged restraint, the Supreme Court had applied that requirement "only in cases in which the defendants were private entities or individuals." *Id.* at 1014 (citations omitted). Unlike California's statute delegating price setting to private wine producers, when a city directly intervenes in the market:

> Because municipal officials generally are politically accountable to the citizens they represent for their decisions regarding the challenged restraint, state supervision is not as necessary to prevent abuse as in the private context.
>
> Moreover, because the *Parker* doctrine requires that the state delegate to the local government the authority to engage in the challenged conduct, state supervision of Kansas City's conduct is unnecessary to find state action. As a leading commentator recently noted:
>
>> requiring state authorization for local conduct is analogous to requiring active supervision of private conduct; it tests whether challenged local activity is truly state action and therefore entitled to immunity.

*Id.* (citing, inter alia, Areeda, *Antitrust Law* ¶ 212.2a, at 47 (1982 Supp.)). Thus, at least where a municipality executes "a traditional governmental function to protect public health and safety," *id.* at 1014 n.13, the state action doctrine requires only that it act pursuant to state policy and does not require active state supervision.

Two years later, in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), the Supreme Court echoed the Eighth Circuit's reasoning in *Gold Cross Ambulance*:

> In [*Midcal*,] a unanimous Court held that supervision is required where the anticompetitive conduct is by private parties. In *Boulder*, however, the most recent relevant case, we expressly left this issue open as to municipalities. We now conclude that the active state supervision requirement should not be imposed in cases in which the actor is a municipality.
>
> . . .
>
> [T]he requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy. . . . Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. . . . Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Hallie*, 471 U.S. at 46-47. In *Hallie*, the City of Eau Claire was the only defendant. It remained somewhat unclear whether the state action immunity doctrine would also shield a private actor alleged to have conspired with a municipality in the course of the municipality's execution of a properly delegated function.

That question seems to have been resolved, at least in the Eighth Circuit, by *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517 (8th Cir. 1985) – a highly analogous case to that now before the Court. There, the City of Heber Springs, Arkansas, granted a solid waste disposal franchise to a private firm, Lake City Sanitation. Lake City Sanitation had devised the franchise scheme, but plaintiff L & H Sanitation then submitted a lower bid. The municipality rejected both bids and invited Lake City Sanitation officials to a private meeting. When L & H Sanitation officials caught wind of the meeting and decided to attend, they were asked to leave. The municipality awarded the solid waste disposal franchise to Lake City Sanitation at the meeting, and L & H Sanitation sued Lake

City Sanitation and municipal officials for conspiring to restrain trade and to create a monopoly. *Id.* at 519.

The Eighth Circuit's decision quoted extensively from *Hallie*, noting that the active state supervision requirement "should not be imposed in cases in which the actor is a municipality." *Id.* at 520 (quoting *Hallie*, 471 U.S. at 46). It then provided the Eighth Circuit state action immunity rule: (1) the state legislature must have authorized the challenged municipal activity, and (2) the legislature must have intended to displace competition. *Id.* at 521. After quoting the relevant Arkansas statute, the Eighth Circuit applied the state action immunity rule in a single paragraph:

> The Arkansas Solid Waste Management Act does not expressly grant municipalities the power to grant exclusive solid waste disposal franchises. However, we agree with the district court that the legislative intent to displace competition can be inferred from the statutory scheme because it is a necessary and reasonable consequence of engaging in the authorized activity. Under the Arkansas Solid Waste Management Act municipalities are granted broad authority to regulate solid waste management and to enter into agreements to provide for solid waste management and disposal. Regulation of solid waste management is one of the traditional public health functions of local government, and Arkansas law recognizes the validity of a municipal grant of a private monopoly in solid waste disposal. It certainly cannot be said that Arkansas has adopted a policy of indifference or mere neutrality respecting the municipal actions challenged as anticompetitive. Rather, we agree that the legislative scheme contemplates displacing competition with regulation in the area of solid waste management and disposal.
>
> In sum, we hold that the state action immunity doctrine is applicable to the city's award of the exclusive solid waste disposal franchise to Lake City. This holding makes any discussion of the question of Lake City's immunity under the *Noerr-Pennington* doctrine unnecessary.

*Id.* at 522 (citations and internal quotations omitted). Thus, in *L & H Sanitation*, the Eighth Circuit shielded from federal antitrust law not only city officials but also the private company awarded the franchise by the city, without requiring active state supervision of the city's decision.

The Missouri statute in this case and the Arkansas statute in *L & H Sanitation* are so similar that *L & H Sanitation* must control, and Defendants Jefferson City and Allied are entitled to state action immunity from Plaintiff Massengale's federal antitrust claim. The Eighth Circuit quoted the Arkansas statute as follows:

> **82-2705. Municipal solid waste management systems.**-(a) All municipalities shall develop a plan to provide a solid waste management system and shall adequately provide for the disposal of solid wastes generated or existing within the incorporated limits of such municipality or in the area to be served thereby and in accordance with the rules, regulations, and orders of the Commission [or Department of Pollution Control and Ecology]. The governing body of the municipality may enter into agreements with a county or counties, with one or more other municipalities, with private persons or trusts, or with any combination thereof, to provide a solid waste management system or any part thereof for the municipality, but such agreement shall not relieve the parties thereto of their responsibilities hereunder. . . .

*Id.* at 522 n.2 (quoting Ark. Stat. Ann. § 82-2701 (1976)). The Missouri statute here provides, in relevant part:

> **260.215. Solid wastes, how handled–duties of cities and counties–exemptions–charges, how stated, how collected.**
>
> 1. . . . [E]ach city . . . shall provide individually or collectively for the collection and disposal of solid wastes for those areas within its boundaries that are to be served by the solid waste management system; shall be responsible for implementing their approved plan required by section 260.220 as it relates to the storage, collection, transportation, processing, and disposal of their solid wastes; and may purchase all necessary equipment, acquire all

15

necessary land, build any necessary buildings, incinerators, transfer stations, or other structures, lease or otherwise acquire the right to use land or equipment. Each city and county may levy and collect charges for the necessary cost of providing such services . . . .

2. Any city or county may adopt ordinances or orders, rules, regulations, or standards for the storage, collection, transportation, processing or disposal of solid wastes which shall be in conformity with the rules and regulations adopted by the [Department of Natural Resources] for solid waste management systems. Nothing in sections 260.200 to 260.245 shall usurp the legal right of a city or county from adopting and enforcing local ordinances, rules, regulations, or standards for the storage, collection, transportation, processing, or disposal of solid wastes equal to or more stringent than the rules or regulations adopted by the department . . . .

3. (1) Cities or counties may contract as provided in chapter 70, RSMo, with any person, city, county, common sewer district, political subdivision, state agency or authority in this or other states to carry out their responsibilities for the storage, collection, transportation, processing, or disposal of solid wastes. . . .

Mo. Rev. Stat. § 260.215.

Thus, while the Missouri statute does not expressly grant municipalities the power to grant exclusive solid waste disposal contracts, it clearly provides for such authority. Moreover, as with the Arkansas statute in *L & H Sanitation*, a "legislative intent to displace competition can be inferred from the statutory scheme because it is a 'necessary and reasonable consequence of engaging in the authorized activity.'" *L & H Sanitation*, 769 F.2d at 522 (quoting *Gold Cross Ambulance*, 705 F.2d at 1013.). Under the Missouri statute, municipalities are granted broad authority to regulate solid waste management and to contract with private companies to provide for solid waste management and disposal. As was true with Arkansas caselaw in *L & H Sanitation*, Missouri caselaw also recognizes the

validity of a municipal grant of a private monopoly in solid waste disposal. *See State ex rel. City of Macon v. Belt*, 561 S.W.2d 117, 118 (Mo. 1978). Here, as in *L & H Sanitation*, "the legislative scheme contemplates displacing competition with regulation in the area of solid waste management and disposal." *L & H Sanitation*, 769 F.2d at 522 (citing *Central Iowa Refuse Sys., Inc. v. Des Moines Metro. Solid Waste Agency*, 715 F.2d 419, 426-28 (8th Cir. 1983)).

For the reasons stated above, the Court concludes that the state action immunity doctrine is applicable to Defendant Jefferson City's award of the exclusive Solid Waste Contract to Defendant Allied. This ruling makes any discussion of the question of Allied's immunity under the *Noerr-Pennington* doctrine unnecessary. Defendants' motions for summary judgment are granted with respect to Count III of Plaintiff Massengale's Petition alleging violations of federal antitrust law.

### C. Remaining State Law Claims

Plaintiff Massengale's remaining claims are all asserted under Missouri law. To avoid needless decisions of state law, the Court remands the action to the Circuit Court of Cole County, Missouri. *See Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997) ("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law." (internal quotation marks and citation omitted)); 28 U.S.C. § 1367(c)(3) (court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it had original jurisdiction).

## III. Conclusion

Accordingly, it is hereby ORDERED that the Motion for Summary Judgment [Doc. # 39] filed by Defendant Allied and the Motion for Summary Judgment [Doc. # 41] filed by Defendant Jefferson City are GRANTED only with respect to Count III of Plaintiff's Petition. The remainder of the action is REMANDED to the Circuit Court of Cole County, Missouri.

 s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 2, 2011  
Jefferson City, Missouri